UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MARTHA ELIZABETH, INC., a Michigan corporation, and MARTHA RAPP, a Michigan resident,<br><br>    Plaintiffs,<br><br>        v.<br><br>SCRIPPS NETWORKS INTERACTIVE, LLC, an Ohio corporation,<br>SCRIPPS NETWORKS, LLC, a Delaware corporation,<br>COOKING CHANNEL, LLC, a Delaware corporation, and<br><br>B360 MEDIA, INC.., a Canadian corporation,<br><br>    Defendants. | Case No. 1:10-cv-1244 |

## OPINION ON PLAINTIFF'S APPLICATION
## FOR PRELIMINARY INJUNCTION

This action arises under federal trademark law, namely the Lanham Act sections 32(1)

and 43(a), codified at 15 U.S.C. §§ 1114(a) and 1125(a), with pendent claims for trademark

infringement and unfair competition under Michigan common law and violation of the Michigan

Consumer Protection Act (MICH. COMP. LAWS § 455.901).  The plaintiffs are Michigan

corporation Martha Elizabeth, Inc. (hereinafter "MEI"), and its president, Michigan citizen

Martha Rapp ("Rapp"), *see* Complaint filed December 15, 2010 ("Comp") ¶¶ 2-3.  The

defendants are Ohio corporation Scripps Networks Interactive, Inc. and Delaware/New York

corporation Scripps Networks LLC (together "Scripps"), Delaware/New York corporation

Cooking Channel LLC ("Cooking Channel"), and Canadian corporation B360 Media, Inc. ("B360"), *see* Comp ¶¶ 4-7 and 32.

Scripps Networks, LLC is a subsidiary of Scripps Networks Interactive, Inc. *See* Affidavit of Michael Smith, General Manager of the Cooking Channel, executed March 14, 2011 ("Smith Aff") (Doc 21-2) ¶ 1. Scripps has two television networks related to food: the Food Network, which is intended to be "a large mass[-]appeal food channel that targets an all[-]American, mainstream audience, and The Cooking Channel, which was formed when Scripps rebranded its former Fine Living Channel (Comp Ex O) and is positioned "as a niche player in a smaller but passionate demographic" and offers "non-mainstream" programming which "covers a broader range of topics in greater depth", Smith Aff (Defs' PI Opp, Ex B) ¶¶ 2. B360, which was founded by Joshua Dorsey and Nadia Giosia in 2007, *see* Comp ¶ 32, "provides integrated media services – strategy, branding, design, production and deployment – to national and multi-national clients" Comp Ex C (Bitchin' Kitchen website page). Giosia notes her background in marketing and has been featured in newspaper web-logs ("blogs") regarding methods for successfully building a brand, PI Ex 5 (Los Angeles Times blog article), while B360 president Dorsey has about ten years of experience as director of film, television, and "new media", Comp Ex D (Dorsey's profile n http://www.linkedin.com).

Since 2002, plaintiff Rapp has owned a retail business specializing in products for the home chef, including "commonplace kitchen items such as aprons, cookbooks or spatulas, to exclusive gourmet products, as well as hard-to-find specialty goods and novelties", and does business both through a physical store located in Pentwater, Michigan ("the Bitchen Kitchen Shop") and through the website http://www.thebitchenkitchen.com ("the Bitchen Kitchen

website"),Comp ¶¶ 10-11, collectively referred to as "the BK business."  Bitchen Kitchen was a continuation and expansion of a business which Rapp had owned since 1986 in the same Michigan town, Chez Moi, *see* Declaration of Martha Rapp executed February 8, 2011 ("Rapp Dec") ¶¶ 1, 3 & 6.  Rapp chose the name Bitchen Kitchen because her time in California led to the understand that in colloquial usage, "bitchin'" meant "cool" or "hip", and she altered the spelling from Bitchin' to Bitchen because that served as a more useful or catchy complement to Kitchen.  *See* Declaration of Martha Rapp executed February 8, 2011 ("Rapp Dec") ¶¶ 2-3. Rapp inaugurated the Bitchen Kitchen website in early 2004 (displaying products but requiring customers to call the store to make a purchase), and by September 9, 2004 she had purchased the domain name [www.thebitchenkitchen.com](www.thebitchenkitchen.com) and redesigned the website to allow direct online purchases, *see* Rapp Dec ¶¶ 20-23.

The Bitchen Kitchen business sells products bearing the Bitchen Kitchen mark, such as shopping bags, aprons, stickers, and coffee mugs; it also sells or has sold kitchenware endorsed by or affiliated with celebrity chefs – such as Emeril Lagasse pans, Rachael Ray food processors, and the Rachael Ray cooking magazine – as well as "As Seen on TV"-branded items such as the Magic Bullet countertop blender, *see* Rapp Dec ¶¶ 7-9.  Emphasizing the broad reach of the Bitchen Kitchen business, Rapp notes that her brick-and-mortar store is visited by customers from across the country and around the world – estimated at 30,000 to 50,000 individuals in 2010 – in part because of the desireable location of Pentwater on the shore of Lake Michigan and in part because of the pleasant, unique shopping experience, which is characterized by Rapp herself chatting with customers, yellow canaries singing, a varied inventory, and a sophisticated, knowledgeable staff, *see*  Rapp Dec ¶¶ 10-14.  The Bitchen Kitchen business has sold and

shipped products to customers in all 50 States and in ninety-one foreign countries over the 14-month period from December 2009 through January 2011 inclusive, *see* Rapp Dec ¶¶ 48-49.

Rapp alleges that she "sought federal trademark protection" for the BK brand "shortly after opening The Bitchen Kitchen Business", but she did not actually apply for federal registration of The Bitchen Kitchen trademark until March 2006, Comp ¶¶ 22-23 and Rapp Dec ¶ 24. In August 2007, the United States Patent and Trademark Office ("PTO") issued registration number 3,285,907 to Rapp for The Bitchen Kitchen, and she continues to hold record title to that registered trademark ("the mark") and contends that it remains valid, Comp ¶¶ 24-25 and Rapp Dec ¶ 25.[1] Before registering the Bitchen Kitchen mark, the PTO's examining attorney searched the agency's records for confusingly-similar marks and stated that "no similar registered or pending mark has been found that would bar registration under Trademark Act Section 2(d), 15 U.S.C. § 1052(d).[2] TMEP § 704.02." PI at 5 (quoting PTO Office Action dated

---

[1]

Although the parties do not mention it, online PTO records show that other individuals applied to federally register the mark "Bitchen Kitchen" (without the word "The") on two occasions but abandoned those applications, years before plaintiff Rapp applied for her "The Bitchen Kitchen" mark.

Namely, California resident Carolyn Sanders applied for registration of "Bitchen Kitchen" in September 1990 but abandoned the application in July 1991 (serial number 74099700). *See* http://tess2.uspto.gov/bin/showfield?f=doc&state=4002:pvlr40.2.3.

Also in September 2000, four California residents – Stephene Forte, Christine Gomez, Nancy Lin, and Samantha Campbell – applied for federal registration of a service mark "Bitchen Kitchen", but they abandoned the application in September 2001 (serial number 78025135). *See* http://tess2.uspto.gov/bin/showfield?f=doc&state=4002:pvlr40.2.2.

[2]Sections 2(d) and 2(e) of the federal Trademark Act provide as follows:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it –

\* \* \*

(d)    Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.

Provided, That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this chapter; (2) July 5, 1947, in the case of registrations previously issued under the Act of March 3, 1881, or February 20, 1905, and continuing in full force and effect on that date; or (3) July 5, 1947, in the case of applications filed under the Act of February 20, 1905, and registered after July 5, 1947.

Use prior to the filing date of any pending application or a registration shall not be required when the owner of such application or registration consents to the grant of a concurrent registration to the applicant. Concurrent registrations may also be issued by the Director when a court of competent jurisdiction has finally determined that more than one person is entitled to use the same or similar marks in commerce. In issuing concurrent registrations, the Director shall prescribe conditions and limitations as to the mode or place of use of the mark or the goods on or in connection with which such mark is registered to the respective persons.

(e)    Consists of a mark which

(1)    when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them,

(2)    when used on or in connection with the goods of the applicant is primarily geographically descriptive of them, except as indications of regional origin may be registrable under section 1054 of this title,

(3)    when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them,

(4)    is primarily merely a surname, or

Sept. 2, 2006 at 1). MEI states, without contradiction from the defendants, that nobody filed a proceeding in opposition to its registration of the Bitchen Kitchen trademark, and to date, said trademark registration has not been challenged.[3]

Rapp licenses the BK mark exclusively to MEI, meaning that no other person or entity is entitled to use it, and they have used the mark consistently and without interruption since at least June 2002 in connection with the online and offline sale of kitchenware, kitchen linens, gourmet foods, and small kitchen appliances, Comp ¶¶ 27-29 and Rapp Dec ¶ 27. MEI submits photographs showing t-shirts, chef's hats, towels, aprons, coffee mugs, jam containers, barbecue sauce containers, and body-lotion containers bearing the Bitchen Kitchen mark, *see* PI Ex 3.

According to plaintiffs MEI and Rapp, the BK business's sales increased steadily from

---

      (5)       comprises any matter that, as a whole, is functional.

15 U.S.C. § 1052(d) and (e).

[3]Section 2(f) of the federal Trademark Act provides as follows:

Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made. * * *

A mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, *may be refused registration only pursuant to a proceeding brought under section 1063 of this title*. A registration for a mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may be canceled pursuant to a proceeding brought under either section 1064 of this title or section 1092 of this title.

15 U.S.C. § 1052(f) (italics added).

2002 into 2010, including a 400% increase in website sales from 2009 to 2010, Comp ¶¶ 12-13 and Rapp Dec ¶ 44. MEI emphasizes that the BK business prides itself on outstanding customer service and strict control of its brand and enjoys a favorable reputation among consumers, Comp ¶ 14. To promote itself, the BK business advertises extensively both online and offline, running commercials – the plaintiffs claim – on cable television stations such as the Food Network, the Fox News channel, and E! (Entertainment) TV; airing radio stations; posting ads in movie theaters; renting billboards; sending postcards to prospective customers, and advertising on social-media services such as Facebook (where it updates its inventory and announces special sales and events), Comp ¶¶ 15-18. MEI alleges that it has a commercial airing on the Food Network cable-television channel through at least April 2011, *see* PI Ex 4 (receipt for "cable buy").[4] MEI stresses that its advertisements, Facebook page, and the electronic newsletter ("e-

---

[4] Defendant Scripps Networks, LLC's Senior Vice President for Pricing, Planning and Inventory contests any implication that the plaintiffs ran any *national* advertisements with the Food Network or other subsidiary or affiliate of the Scripps Defendants. He explains that there are two ways to purchase ads on SNL networks: buying national ads directly from SNL, and buying local ads from cable companies, such as Comcast, which run during two- to four-minute "local breaks"which SNL permits the local cable operators to sell as they wish with no payment to or clearance from SNL. *See* Affidavit of Robert Shapiro executed March 4, 2011 (Scripps Defs' PI Opp Ex H, Doc 21-8) ¶¶ 2-3. The Scripps executive states as follows:

> [T]he Plaintiff in the matter has asserted that it has advertised on SNL and in particular, the Food Network. SNL maintains computerized records generally known as "traffic and billing software" or "sales system software" that contain the identities of all businesses or individuals who have placed national advertising with SNL. I have done a review of those records back to 1995 and those records disclose no reference whatsoever to Martha Elizabeth, Inc., Martha Rapp, or Bitchen Kitchen.

> I have reviewed Exhibit 4 to Plaintiff's Motion . . . . [It] purports to be the receipt for advertising. I note that the invoice indicates that payment is to be made to Charter Media at P.O. Box 78876, Milwaukee, Wisconsin. Charter Media is an MSO [Multiple System Operator] of SNL and this invoice indicates that this was local advertising as described above which Plaintiff placed with Charter Media. Accordingly, SNL had no involvement

newsletter") which it disseminates to customers through the "Constant Contact" company, bear the unique logo it created which bears the BK trademark, which consumers have come to associate exclusively with MEI and Rapp, *see* Comp ¶¶ 16 & 19-20 & 48 and Rapp Dec ¶18 and PI Ex P (Bitchen Kitchen fan page on Facebook website).

At an unspecified time in 2007, defendant B360 broadcast from Canada the first podcast of a cooking show entitled "Bitchin' Kitchen'", which was three minutes long and hosted by Nadia Giosia, who goes by the moniker "Nadia G"; boasts on the podcast that she "can cook up a storm in three-inch cherry stilettos"; routinely employs sexual innuendo, provocative attire, and off-color humor; offers recipes entitled "Save-your-sex-life Souffle" and "Save-your-sex-life Shepherd's Pie" and "deflate your mate Part One"; posts a biographical summary online which states that "[b]right red lips, wild hairstyles and sexy heels are the name of her game"; and has a Facebook page displaying photos of her wearing a negligee and high heels and carrying a whip, *see* Comp ¶¶ 30-31 and 34-36 and 39. Defendant B360 broadcasts and advertises the Bitchin' Kitchen podcast on the websites http://www.bitchinlifestyle.tv and http://www.bitchinkitchen.tv, and it also advertises the podcast and Nadia G on its Facebook page, *see* Comp ¶¶ 37-38 and Ex G. B360's website http://www.bitchinlifestyle.tv publishes articles with titles such as "Bitchin' Babes" and "Good Girls Going Bad", and it makes available a video entitled "I'm never drinking like that again" under the lead-in "Partied too hard last night? Hangover? Bitchin' Kitchen feels you. This song is all about those famous words: 'I'm Never Drinking Like That Again'", *see* Comp ¶¶ 40-41 and Ex H. B360's bitchinkitchen.tv website also has contained an article entitled

---

whatsoever in that advertising, nor any knowledge that the advertising had been placed. Shapiro Aff ¶¶ 4-5.

"Good Girls Going Bad", with a thumbnail photograph of a naked woman which is strategically covered only by two black rectangular bars reading "censored", Comp Ex I.

In summer 2008, a vendor representing a publishing company came into Rapp's store in Pentwater, Michigan and showed her a catalog, which included a forthcoming cookbook featuring Nadia G entitled "Bitchin' Kitchen Cookbook: Rock Your Kitchen – And Let the Boys Clean Up the Mess", Rapp Dec ¶¶ 28-30. The vendor allegedly told Rapp's employee that the store should sell the cookbook because it used the name of her business, Rapp Dec ¶ 31. In December 2008, B360 published the cookbook, Comp ¶ 42. According to a B360 press release issued in 2010, this "best-selling cookbook . . . has topped charts on Amazon and is available at Barnes & Nobles [sic], Chapters-Indigo [a major Canadian retail bookstore/music chain], Spencer's Gifts and over 1,000 specialty shops in North America and the U.K.", Comp Ex F.

When Rapp learned in mid-2008 that B360 was planning to publish the Bitchin' Kitchen cookbook, she had her lawyers send a cease-and-desist letter to the intended publisher, *see* Comp ¶ 43 and Rapp Dec ¶ 32 and Comp Ex J (Rapp's counsel's July 18, 2008 case-and-desist letter). B360 president Dorsey called Rapp, acknowledged receipt of the cease-and-desist letter, and stated that he intended to use the phrase "Bitchin' Kitchen" only for the podcast and the related cookbook, which he opined would cause no conflict with Rapp/MEI's Bitchen Kitchen business, Comp ¶¶ 44-47 and Rapp Dec ¶¶ 33-36. When Rapp responded that she felt B360's use of "Bitchin' Kitchen" was close enough to her registered trademark "Bitchen Kitchen" to cause confusion, B360's president assured her that the Bitchin' Kitchen cookbook would be sold only in Canada and the mark would be used only in Canada, and that he would agree to those limitations in writing, but he rebuffed or failed to respond to her subsequent attempts to obtain a

copy of the promised written agreement, Comp ¶¶ 48-51 and Rapp Dec ¶¶ 37-42. Contrary to the alleged promise of B360's president, B360 began selling the cookbook in the United States in December 2008,, "with clear and actual knowledge of Plaintiffs' intellectual property rights"; as of early December 2010 it ranked #2 in sales on amazon.com in a subset of the Cooking category, Comp ¶¶ 52-54 and 70. Plaintiff MEI also charges that apart from the publication of the Bitchin' Kitchen cookbook, defendant B360 took other steps to expand the Bitchin' Kitchen podcast and the related Nadia G brand to the American market in violation of MEI's rights in the Bitch*en* Kitchen trademark, such as by expanding Nadia G from the Bitchin' Kitchen podcast to a cable television series, Comp ¶ 55.

**Defendant B360's Unsuccessful Pending or Suspended Application to Trademark "Bitchin' Kitchen."**

In December 2007, B360 applied to the PTO to register "Bitchin' Kitchen" as a trademark, representing that it had a "bona fide intention to use the mark in commerce"– specifically, on goods and services "featuring entertainment and educational entertainment programs in the fields of comedy, cooking . . . and lifestyle", such as [b]ooks in the fields of comedy, cooking . . . and lifestyle . . .", recipe books, newsletters featuring so-called comedy cooking, printed recipe cards, recipe card holders, refrigerator decals, and aprons, *see* Comp ¶¶ 56-59 (quoting Ex K). MEI alleges, without contradiction by the defendants, that B360, through its Bitchin' Kitchen and Bitchin' Lifestyle websites and social-media pages, does appear to sell spatulas, t-shirts and other kitchen items. *See* PI at 10 (citing Comp Ex B ("she offers zebra and leopard print aprons with matching garters, a guitar[-]shaped spatula, hot pink diva dish gloves

-10-

and rockin' Bitchin' Kitchen tees.")).

B360's American trademark application claimed priority over its Canadian "Bitchin'
Kitchen" application, which it had filed about six months earlier in June 2007, Comp ¶ 61 and
Ex L, but in both the Canadian and American applications B360 alleged that it had first used the
Bitchin' Kitchen mark on those goods and services on June 1, 2002, *"the same exact date of first
use claimed by Plaintiff in her U.S. trademark application"*, Comp ¶ 62 (emphasis in original).[5]
Plaintiff MEI notes that, contrary to what B360 claims in its American and Canadian trademark
application, B360 has stated in a press release and in a Nadia G biographical summary that the
Bitchin' Kitchen Canadian cable series did not begin until 2007, Comp ¶ 63 and PI at 11 (citing
Comp Ex B (Nadia Giosia biographical summary) and Comp Ex C (press release)).

In April 2008 the PTO issued an initial denial of B360's Bitchin' Kitchen trademark
application, finding a likelihood of consumer confusion with MEI's pre-existing registered

---

[5]

"In section 44(d) of the Lanham Act, Congress detailed circumstances under which holders
of foreign registered marks can claim priority rights in the United States, notably including among
those circumstances actual or intended use in the United States within a specific period of time."
*ITC, Ltd. v. Punchgini, Inc.* 482 F.3d 135, 164 (2d Cir. 2007) (citing 15 U.S.C. § 1126(d) and
synopsizing it as "affording United States priority rights from date of foreign registration if, *inter
alia*, application for United States registration is filed within six months along with a statement of
*bona fide* intent to use the marks in commerce, but denying mark holder right to sue for acts
committed prior to United States registration unless registration based on actual use in commerce"));
*see also* Trademark Manual of Examining Procedure § 1003 (explaining filing under Trademark Act
section 44(d)), published by PTO at http://tess2.uspto.gov/tmdb/tmep/1000.htm#_T1003, last
accessed March 21, 2011.

Once the underlying foreign application matures into a trademark registration in the foreign
country, title 15 U.S.C. § 1057(c) renders the foreign filing date the constructive date of first use *in
the United States*. *See* http://tess2.uspto.gov/tmdb/tmep/1000.htm#_T1003, last accessed March 21,
2011 (citing *SCM Corp. v. Langis Foods, Ltd.*, 539 F.2d 196, 190 U.S.P.Q. 288 (D.C. Cir. 1976))
(emphasis added).

Bitch*en* Kitchen mark, *see* Comp ¶ 64 and PI Ex 6 (PTO's April 4, 2008 Office Action).  In

B360's October 2008 response to the PTO, it alleged that its mark had "peacefully coexisted"

with MEI's earlier-registered mark for 18 months without any known instance of consumer

confusion, and B360 president Dorsey affied that to the best of his knowledge, no other person

had the right to use in commerce any mark "in such near resemblance thereto as to be likely,

when used on or in connection with the goods/services of such other person, to cause confusion

or to cause mistake, or to deceive . . . .", Comp ¶¶ 66-68.  Attempting to portray this sworn

statement as knowingly false, MEI emphasizes that by the time B360's president filed this

statement with the PTO, he had just spoken a month or two earlier ("late summer 2008") with

MEI president Rapp about the possibility of consumer confusion between the Bitch*in'* Kitchen

and Bitch*en* Kitchen marks, Comp ¶¶ 65 & 69.  Nonetheless, [i]n his submission to the [PTO],

Mr. Dorsey did not disclose his conversation with Ms. Rapp about the Bitchin' Kitchen

Cookbook – or the asserted false representations that he made to her . . . .", PI at 13-14.

Plaintiff MEI alleges both that B360's American trademark applications remains pending

and that "at last check, the [PTO] had sustained the rejection . . . based upon the strong

likelihood of consumer confusion with Ms. Rapp's federal registration for THE BITCHEN

KITCHEN trademark."  Comp ¶ 72 (citing Ex M).  MEI's opening brief further alleges that the

PTO "has informed Defendant B360 on no fewer than *six* occasions that it considers B360's

Bitchin' Kitchen mark confusingly similar to Plaintiffs' The Bitchen Kitchen Mark", PI at 2,

namely via the April 4, 2008 Office Action (PI Ex 6); a Suspension Letter issued November 16,

2008 ("Applicant's arguments regarding . . . Registration No. 3285907 have been considered and

found unpersuasive and the refusal is maintained and continued as to the specified goods and

services."); a Suspension Inquiry issued June 8, 2009 ("the following refusal and requirements are continued and maintained: . . . Registration of the applied-for mark was refused because of a likelihood of confusion with the mark in U.S. Registration No. 3285907."); a Suspension Letter issued December 15, 2009 (same); a Suspension Inquiry issued June 22, 2010 (same); and a Suspension Letter issued January 7, 2011 (same), *see* PI at 23 n.4 (citing www.uspto.gov, Prosecution History for Serial No. 77/3601569). Defendant counters that there has been only one rejection to date and that the application is presently suspended (at Oral Argument).

### 2010: The Defendants Broadcast & Advertise "Bitchin' Kitchen" on Canadian & American TV

On an unspecified date in early 2010, the Food Network Canada television station aired the premier of Bitchin' Kitchen, which was no longer a short podcast or online TV show, but now a thirty-minute TV cooking show starring Nadia G, *ee* Comp ¶ 73 (citing Ex C). In mid-2010, defendants B360-, Scripps and the Cooking Channel announced the October 2010 premiere of the Bitchin' Kitchen cable TV series in the United States on the Cooking Channel, and they intensively advertised the premiere on "various nationwide cable television networks controlled, owned, or operated by Scripps" and on the Cooking Channel and Cooking Channel sister stations such as HGTV, Food Network, Travel Channel, DIY (Do-It-Yourself) Network, and GAC (Great American Country), and on websites including bitchinkitchen.com, "Nadia G websites", Facebook fan pages, Twitter, other social-media sites, and other sites controlled or operated by Scripps, *see* Comp ¶¶ 76-82 (citing Ex N (SNI's "10-Q" Securities and Exchange Commission filing dated November 4, 2010) at F-17 for identity of Cooking Channel sister

stations).

Presumably to accentuate the impact of such advertising on the public and its perception of the two similar marks, MEI notes that for the quarter ending September 30, 2010, defendant SNL's Lifestyle Media Segment spent over $316 million on advertising and turned a profit of about $232.5 million, while the Cooking Channel had 58.1 million subscribers and generated over $12 million in revenue for SNL, *see* Comp ¶¶ 84-88 and PI Ex N at F-23. The Cooking Channel's subscriber base increased 4.3% from third quarter 2009 to third quarter 2010, and its September 2010 prime-time viewership was 15% higher than the year-earlier figure for its predecessor Fine Living Channel. *See* Comp Ex N at F-18 and F-19.

At 10:30 p.m. on October 6, 2010, defendant B360's Bitchin' Kitchen cable series premiered on the Cooking Channel in the U.S., whereupon concerned customers of Rapp's "Bitchen Kitchen" business contacted her and expressed consternation at the content of the Bitchin' Kitchen cable TV series, which they erroneously assumed Rapp had sponsored, *see* Comp ¶¶ 89-91.[6] Within days of the Bitchin' Kitchen American cable TV premiere, Bitchen Kitchen founder and MEI president Rapp "began receiving more complaints about the show and spent more time responding to customer questions about whether The Bitchen Kitchen Business was affiliated with or sponsored the show", Rapp Dec ¶ 53. *See Prudential Ins. Co. v. Prudential Title Co.*, 189 U.S.P.Q. 617 (S.D. Tex. 1976) and *Susan, Inc. v. Thomas*, 26 U.S.P.Q. 1804, 1993 WL 93333 (D. Kan. 1993) ("It is logical to conclude that these enquiries are evidence of some confusion regarding plaintiff's possible affiliation with defendant's

---

[6]Non-party Tricon Films, Inc., and defendant Cooking Channel contracted to obtain a three-year license for the Bitchin' Kitchen program, with Scripps Networks paying $10,000 per episode for thirteen episodes. *See* Smith Aff (Doc 21-2) ¶ 3.

business.").  As further evidence of consumer confusion, MEI alleges that at least one consumer, Andrea Wilson, was confused when she looked for the defendants' Bitchin' Kitchen Facebook page and instead found plaintiff Rapp's Bitchen Kitchen Facebook page, *see* Comp ¶ 92 and PI at 16 (citing Rapp Dec ¶ 53 and Comp Ex P), and the owners of other Michigan kitchen stores have asked Rapp whether her Bitchen Kitchen business is somehow connected to the racy TV series of almost exactly the same name, *see* Rapp Dec ¶ 54.

In further support of their claim for damages and their contention that they will be irreparably harmed absent a preliminary injunction, MEI and Rapp allege that around the time the defendants premiered the Bitchin' Kitchen TV series in the USA (October 2010), Rapp's Bitchen Kitchen web-store no longer appeared on the first page of search-engine results for the query "Bitchen Kitchen", supplanted by information related to the Bitchin' Kitchen TV series and Nadia G, *see* Comp ¶¶ 93-94 and Comp Ex Q.  But the Scripps Defendants respond that even more-recent online searches tell quite a different story, with plaintiff MEI's Bitchen Kitchen showing up quite prominently and readily, both in absolute terms and relative to defendant B360's Bitchin' Kitchen websites and the Scripps Defendants' related websites, *see* Affidavit of Scripps Defendants' counsel Jennifer A. Dukarski, Esq., executed March 14, 2011 (Defs' PI Opp Ex E, Doc 21-5) ("Dukarski Aff").  Specifically, a February 16, 2011 bing.com search for the term "Bitchen Kitchen" yielded a first page listing  #1 IKEA, #2 B360's Bitchin' Lifestyle website, and #3 the plaintiffs' Bitchen Kitchen, *see* Dukarski Aff ¶ 5.  Second, a google.com search also run on February 16, 2011 for the term "Bitchen Kitchen" yielded a first page listing #1 defendant Cooking Channel, #2 defendant B360's Bitchin' Lifestyle, #3 plaintiffs' Bitchen Kitchen, #4 unspecified, and #5 again plaintiffs' Bitchen Kitchen, *see*

Dukarski Aff ¶ 6. Third, a yahoo.com search for the term "Bitchen Kitchen" on that same date yielded #1 IKEA, #2 plaintiffs' Bitchen Kitchen, #3 unspecified, and #4 again plaintiffs' Bitchen Kitchen, *see* Dukarski Aff ¶ 7. Fourth, an ask.com search for the term "Bitchen Kitchen" on February 16, 2011 yielded the plaintiffs' Bitchen Kitchen "on the first page as the seventh and tenth result[s] . . . following Cooking Channel, antivirus software, cabinets, kitchen improvement, kitchen and bath remodeling, and defendant B360's Bitchin' Lifestyle website, *see* Dukarski Aff ¶ 8.[7]

_____

[7]The court performed its own online searches for the term "Bitchen Kitchen" on March 23, 2011, yielding the following results:

Bing.com Search Engine

| | | |
|---|---|---|
| #1 | bitchinlifestyle.tv | (Defendant B360) |
| #2 | thebitchenkitchen.com | (Plaintiffs) |
| #3 | www.cookingchanneltv.com/bitchin-kitchen/index.html | (Defendant CC) |
| #4 | www.foodnetwork.ca/ontv/shows/Bitchin-Kitchen/show.html?titleid=248313 | |
| #5 | SF Weekly blog article "Bitchin Kitchen's Nadia G, the Punk Rock Julia Child" | |
| #6 | LA Times blog article "Nadia Giosia Dishes on Her Bitchin' Kitchen . . ." | |
| #7 | www.bitchenkitchen.net | (Plaintiffs) |
| #8 | bitchinlifestyle.tv/recipes.html | (Defendant B360) |
| #9 | www.clicker.com/web/bitchin-kitchen (to watch episodes) | |
| #10 | bitchinkitchen.com.au (Australian website) | |

Google.com Search Engine

| | | |
|---|---|---|
| #1 | www.thebitchenkitchen.com home page | (Plaintiffs) |
| #2 | www.thebitchenkitchen.com page for "the clever cutter" | (Plaintiffs) |
| #3 | www.bitchinlifestyle.tv | (Defendant B360) |
| #4 | www.cookingchanneltv.com page for Nadia G's Bitchin' Kitchen | (Defs. CC & B360) |
| #5 | bitchenkitchen.net blog | (Seemingly unrelated) |
| #6 | www.yelp.com review for The Bitchen Kitchen in Pentwater, MI | (Plaintiffs) |
| #7 | www.facebook.com page "RIP Bitchen Kitchen" | (Defunct restaurant) |
| #8 | L.A. Times "Bitchen Kitchen / Bicycle Kitchen" | |
| #9 | www.urbanspoon.com review of Bitchen Kitchen restaurant in Bennington, Vermont | |
| #10 | www.youtube.com links to two videos, one of Nadia G's Bitchin' Kitchen and one from plaintiffs' Bitchen Kitchen store in Pentwater, MI | |

Yahoo..com Search Engine

The Scripps Defendants rightly point out, however, that the plaintiffs have presented no evidence of their search-engine rankings *before* the Bitchin' Kitchen program began airing on American cable television, Defs' Opp at 18, and before the show began, presumably, airing on the Internet as well, whenever that occurred. *See* http://www.clicker.com/web/bitchin-kitchen/ (offering clips, usually of one- to two-minute duration, from 46 episodes of Nadia G's Bitchin' Kitchen from the 2007, 2008 and 2009 and 2010 seasons), last accessed March 24, 2010. For that matter, the Scripps Defendants do not note, but the court does, that the plaintiffs have not presented any evidence of their search-engine rankings prior to B360's publication of the Bitchin' Kitchen Cookbook and other arguably-infringing activities which expanded the Bitchin' Kitchen brand. In any event, whether or not the mark "The Bitchen Kitchen" has become less prominent on search-engine results because of Bitchin' Kitchen, and whether or not MEI/Rapp's underlying business has correspondingly suffered vis-a-vis what it would have been without the existence of Bitchin' Kitchen, the record does not support the plaintiffs' rather extreme allegations that The Bitchen Kitchen has "all but disappeared" from search-engine results on the Internet. The court therefore accords little weight to the plaintiffs' evidence and assertions regarding search-engine rankings.

---

#1    bitchinlifestryle.tv                                              (Defendant B360)
#2    thebitchenkitchen.com                                            (Plaintiffs)
#3    www.cookingchanneltv.com/btichin-kitchen/index.html      (Defs CC & B360)
#4    www.foodnetwork.ca/ontv/shows/Bitchin-Kitchen/show.html?
#5    SF Weekly blog article "Bitchin Kitchen's Nadia G, the Punk Rock Julia Child"
#6    Bitchenkitchen.net blog                                          (Seemingly unrelated)
#7    www.facebook.com page for Bitchin' Kitchen                       (Defendants)
#8    bitchinkitchen.eventbrite.com ad for Nov. 2010 event in San Diego, CA
#9    LA Times blog article "Nadia Giosia Dishes on Her Bitchin' Kitchen . . ."
#10   bitchinlifestyle.tv/recipes.html                                 (Defendant B360)

-17-

More significant and helpful to the plaintiffs, however, at the top of the list, where the google.com search engine lists "sponsored links", the defendants had misspelled the name of the Bitchin' Kitchen cable TV series to read Bitch*en* Kitchen, "the same unique spelling used by Plaintiffs", which plaintiffs imply was a willful attempt to confuse consumers as to the affiliation, origin and nature of the Bitchen Kitchen mark, reinforcing the tendency of the defendants' other infringing acts to make consumers believe that MEI/Rapp are the junior users of the Bitchen Kitchen mark, *see* Comp ¶¶ 95-96 & 98 and PI at 17 (citing PI Ex 7 (search-engine results from day of PI motion's filing in February 2011). *See also* PI at 2 (alleging that prior to the October 6, 2010 American cable TV premier of Bitchin' Kitchin, "[d]efendants purchased sponsored links on search engines that used Plaintiffs' unique Bitchen Kitchen mark . . . . The sponsored link read 'Bitch*en* Kitchen Every Wednesday at 10:30 pm on Cooking Channel – Don't Miss It!' and included a link to their domain www.cookingchannelTV.com.") (citing no evidence). In addition, Rapp alleges that her "customers have told me that when they search for my business on the Internet, they find information about Defendants, and cannot find The Bitchen Kitchen Web Store," Rapp Dec ¶ 55; *see also* Rapp Dec ¶ 56 ("Roughly around the beginning of December 2010, I spoke to a customer who drove to the Bitchen Kitchen Shop from Ludington, Michigan to make a purchase because he was unable to find the Bitchen Kitchen Online Store on the Internet and instead could only find information about Defendants' Bitchin' Kitchen brand.").

MEI also identifies blogs which use the spelling "Bitch*en* Kitchen" when referring to B360's "Bitch*in'* Kitchen", PI Ex 8, and even a B360 press release which uses Rapp's spelling "Bitch*en* Kitchen" to refer to its own "Bitch*in'* Kitchen" brand, PI Ex 9.

The court performed its own online searches for the term "Bitchen Kitchen" on March

23, 2011, yielding the following results:


Bing.com Search Engine
#1      bitchinlifestyle.tv                                                         (Defendant B360)
#2      thebitchenkitchen.com                                                 (Plaintiffs)
#3      www.cookingchanneltv.com/bitchin-kitchen/index.html     (Defendant CC)
#4      www.foodnetwork.ca/ontv/shows/Bitchin-Kitchin/show.html?titleid=248313
#5      SF Weekly blog article "Bitchin Kitchen's Nadia G, the Punk Rock Julia Child"
#6      LA Times blog article "Nadia Giosia Dishes on Her Bitchin' Kitchen . . ."
#7      www.bitchenkitchen.net                                               (Plaintiffs)
#8      bitchinlifestyle.tv/recipes.html                                     (Defendant B360)
#9      www.clicker.com/web/bitchin-kitchen (to watch episodes)
#10     bitchinkitchen.com.au (apparently an Australian website)

Google.com Search Engine
#1      www.thebitchenkitchen.com home page                         (Plaintiffs)
#2      www.thebitchenkitchen.com page for "the clever cutter"  (Plaintiffs)
#3      www.bitchinlifestyle.tv                                               (Defendant B360)
#4      www.cookingchanneltv.com page for Nadia G's Bitchin' Kitchen  (Defs. CC & B360)
#5      bitchenkitchen.net blog                                             (Seemingly unrelated)
#6      www.yelp.com review for The Bitchen Kitchen in Pentwater, MI  (Plaintiffs)
#7      www.facebook.com page "RIP Bitchen Kitchen"             (Defunct restaurant)
#8      L.A. Times "Bitchen Kitchen / Bicycle Kitchen"
#9      www.urbanspoon.com review of Bitchen Kitchen restaurant in Bennington, Vermont
#10     www.youtube.com links to two videos, one of Nadia G's Bitchin' Kitchen and one from
        plaintiffs' Bitchen Kitchen store in Pentwater, MI

Yahoo..com Search Engine
#1      bitchinlifestyle.tv                                                         (Defendant B360)
#2      thebitchenkitchen.com                                                 (Plaintiffs)
#3      www.cookingchanneltv.com/btichin-kitchen/index.html    (Defs CC & B360)
#4      www.foodnetwork.ca/ontv/shows/Bitchin-Kitchen/show.html?
#5      SF Weekly blog article "Bitchin Kitchen's Nadia G, the Punk Rock Julia Child"
#6      Bitchenkitchen.net blog                                             (Seemingly unrelated)
#7      www.facebook.com page for Bitchin' Kitchen              (Defendants)
#8      bitchinkitchen.eventbrite.com ad for Nov. 2010 event in San Diego, CA
#9      LA Times blog article "Nadia Giosia Dishes on Her Bitchin' Kitchen . . ."
#10     bitchinlifestyle.tv/recipes.html                                     (Defendant B360)

Ask.com Search Engine
#1      www.thebitchenkitchen.com                                        (Plaintiffs)

#2      www.guidetokitchenremodeling.com
#3      wrpage.com/tjgranitandstone.com
#4      www.livingsocial.com
#5      www.thebitchenkitchen.com                                    (Plaintiffs)
#6      www.bitchinlifestyle.tv                                        (Defendants)
#7      www.cookingchanneltv/bitchin-kitchen/index.html               (Defendants)
#8      www.yelp.com review for The Bitchen Kitchen in Pentwater, MI  (Plaintiffs)
#9      www.urbanspoon.com review of Bitchen Kitchen restaurant in Bennington, Vermont
#10     www.facebook.com page "RIP Bitchen Kitchen"                   (Defunct restaurant)

Goodsearch.com Search Engine
#1      Bitchen Kitchen at amazon.com
#2      bitchinlifestyle.tv                                            (Defendants)
#3      www.thebitchenkitchen.com                                     (Plaintiffs)
#4      www.cookingchanneltv.com/bitchin-kitchen/index.html           (Defendants)
#5      SF Weekly blog article "Bitchin Kitchen's Nadia G, the Punk Rock Julia Child"
#6      www.bitchenkitchen.net blog                                   (Seemingly unrelated)
#7      www.facebook.com page for Bitchin' Kitchen                    (Defendants)
#8      bitchinkitchen.eventbrite.com ad for Nov. 2010 event in San Diego, CA
#9      LA Times blog article "Nadia Giosia Dishes on Her Bitchin' Kitchen . . ."
#10     bitchinlifestyle.tv/recipes.html                              (Defendant B360)


**PROCEDURAL HISTORY**

In December 2010 MEI and Rapp filed the instant complaint, asserting six claims:

Count 1          Trademark Infringement, Lanham Act § 32(1), Comp ¶¶ 103-109

Count 2          False Designation of Origin / Unfair Competition, Lanham Act § 43(a),
                 Comp ¶¶ 110-115

Count 3          Trademark Infringement, Michigan Common Law, Comp ¶¶ 116-121

Count 4          Unfair Competition, Michigan Common Law, Comp ¶¶ 122-126

Count 5          Michigan Consumer Protection Act, Comp ¶¶ 127-132

Count 6          Accounting of Profits from Infringement and Related Unlawful Activities
                 , Comp ¶¶ 133-136

In their prayer for relief, MEI and Rapp seek to enjoin the defendants from using the Bitchen

Kitchen mark or any confusingly similar mark to advertise, promote or sell any lifestyle-media

product or program (including but not limited to TV shows, cookbooks, "social media" or other websites, or online or offline retail store services) or from infringing or falsely designating the origin of the Bitchen Kitchen mark, Comp at 21-22 Prayer ¶ 1. MEI further seeks to enjoin the defendants from using or seeking to register the Bitchen Kitchen mark or any confusingly similar mark as a trademark, trade name, corporate name, or domain name, or otherwise engaging in conduct which would cause confusion as to the source, sponsorship or affiliation of MEI/Rapp with the defendants, Comp at 22 Prayer ¶ 2. MEI seeks positive injunctive relief as well, to compel the defendants to immediately remove all uses of the Bitchen Kitchen mark or confusingly similar marks from any location, including websites, cable TV broadcasts, "social media", newsletters and any other websites or media owned, operated or controlled by the defendants, and to give MEI all domain names, social-media identifiers or webpages which publish or containing the Bitchen Kitchen mark or any confusingly similar mark, Comp at 22 Prayer ¶¶ 3-4, such as Facebook, MySpace, Twitter and YouTube pages, *see* PI Mot (Doc 9) at 2 ¶ 4. The preliminary-injunction application suggests additional specific relief not requested by the complaint, namely, enjoining the defendants from using the Bitchen Kitchen mark or any confusingly-similar mark in "bidding on key ad words or otherwise manipulating results in internet search engines . . .", PT Mot (Doc 9) at 1-2 ¶ 1. MEI asks the court to require B360 and the Scripps Defendants to file a written report within thirty days of the court's order explaining specifically how they have complied with its terms, PI Mot at 3 ¶ 7.

In addition, MEI asks the court to declare that its rights in the Bitchen Kitchen mark is valid and enforceable, that the defendants have intentionally infringed the mark under the Lanham Act and Michigan common law (supporting an award of compensatory damages), and

that the defendants' conduct is "exceptional" as defined by the Lanham Act (supporting an

award of treble damages under 15 U.S.C. § 1117(a)), *see* Comp at 22-23 Prayer ¶¶ 5-7 & 9-10.

MEI also asks the court to order the defendants to pay for corrective advertising (presumably to

clarify who owns the Bitchen Kitchen mark), tender all offending products for destruction,

account for and pay over all profits and advantages derived from the infringement, and reimburse

MEI for its reasonable attorneys' fees and costs, and to award prejudgment interest, *see* Comp at

23 Prayer ¶¶ 8 & 11-16.[8]

After reviewing MEI's complaint, the Scripps Defendants' counsel, Stewart, sent a letter

characterizing the lawsuit as frivolous and threatening to seek an award of attorneys fees and

costs if MEI and Rapp did not dismiss the lawsuit.  *See* PI Ex 10 (letter).

Plaintiffs MEI and Rapp jointly applied for a preliminary injunction (Docs 9 and 10) and

the three Scripps Defendants jointly filed an opposition brief**.**


**JURISDICTION AND VENUE**

Because MEI asserts claims under the Lanham Act (counts 1 and 2), the court has

undisputed federal-question jurisdiction pursuant to 28 U.S.C. § 1331 (the general federal-

---

[8]

To obtain monetary damages on a federal trademark-infringement claim of this sort, MEI and Rapp must show that the defendants' use of the Bitchin' Kitchen mark *actually* confused consumers. *See Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp.2d 789, 797 (E.D. Mich. 2010) (Stephen J. Murphy III, J.) (citing *Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982)); *see also Volkswagen AG v. Dorling Kindersley Pub., Inc.*, 614 F. Supp.2d 793, 802 (E.D. Mich. 2009) (citing *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006)).  To obtain equitable relief on such a claim, however, the plaintiffs need only show that the advertisements or other use of the similar mark "'tend to create a false impression . . .'", and they need not show that the defendants intended to create that false impression, *Express Welding*, 700 F. Supp.2d at 797 (citing *Frisch's*, 670 F.2d at 647).

question jurisdiction statute) and 28 U.S.C. § 1338 and 15 U.S.C.§ 1121(a) (the Lanham Act's jurisdictional provision). MEI alleges, without contradiction, that a substantial part of the events and omissions giving rise to its claims occurred in this district, *see* Comp ¶ 9, so venue is proper here pursuant to 28 U.S.C. § 1391(b)(2). The court has undisputed supplemental jurisdiction MEI's state-law claims (counts 3, 4 and 5) pursuant to 28 U.S.C. § 1367, though it has discretion to decline jurisdiction over those claims and dismiss them without prejudice if the federal claims are resolved short of trial.

### LEGAL STANDARD: Preliminary Injunctive Relief

"The level of proof required for the Plaintiff to obtain a preliminary injunction or TRO 'is much more stringent than the proof required to survive a summary judgment motion.'" *Luckett v. U.S. Bank Nat'l Ass'n*, 2009 WL 22858, *2 (E.D. Mich. Jan. 5, 2009) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[W]hat is at issue is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher.").

To obtain preliminary injunctive relief, the plaintiff must show that he is being threatened with a legally cognizable irreparable injury for which there is no adequate legal remedy (such as monetary damages). *See General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (6th Cir. 2009) (" *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (Thomas, J.)); *Michigan Chamber of Commerce*

*v. Land*, 725 F. Supp.2d 665, 684 (W.D. Mich. 2010). [9]

When deciding whether to issue a PI, this court considers (1) whether the plaintiffs have shown a substantial likelihood that they will prevail on the merits, (2) whether there is a threat of irreparable harm to the plaintiffs if the injunction does not issue, (3) whether issuance of the injunction would substantially harm others, and (4) whether issuance of the injunction would serve the public interest. *See Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp.2d 962, 967 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *Warshak v. US*, 490 F.3d 455, 465 (6th Cir. 2007)).[10] The standard is the same whether the applicant seeks an injunction which requires the

---

[9]

The PI applicant's loss of market share or sales typically does not constitute irreparable harm for this purpose, whether in a patent-infringement action, *see FieldTurf USA, Inc. v. Astroturf, Inc.*, 725 F. Supp.2d 609, 617 n.3 (E.D. Mich. 2010) (Stephen J. Murphy III, J.) (citing *Automated Merch. Sys. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009)) and *Edwards LifeSciences AG v. CoreValve, Inc.*, C.A. No. 08-91-GMS, – F. Supp.2d –, 2011 WL 446203, *15 (D. Del. Feb. 7, 2011) (Sleet, C.J.); in a Lanham Act false-advertising action, *see King Pharmaceuticals, Inc. v. Zymogenetics, Inc.*, 2009 WL 4931238, *4 (E.D. Tenn. Dec. 10, 2009) (J. Ronnie Greer, J.) (denying topical thrombin seller's application to preliminarily enjoin competitoir from making claims of superior efficacy and safety claims, because *inter alia* the applicant could not establish that its lost profits and lost market share were not later compensable through money damages) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)); or otherwise.

*Accord Novartis Pharm. Corp. v. Teva Pharm. USA, Inc.,* 2007 WL 2669338, *14 (D.N.J. Sept. 6, 2007) ("Both loss of market share and price erosion are economic harms and are compensable by money damages."), *aff'd*, 280 F. App'x 996 (Fed. Cir. 2008), *cited by Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp.2d 805, 821 (N.D. Ohio 2010) (Jack Zouhary, J.).

[10]

At least two circuits hold that likely success on the merits is a *sine qua non* of injunctive relief. *See AFGE, AFL-CIO v. US*, 104 F. Supp.2d 58, 64 (D.D.C. 2000); *Wine & Spirits Retailers, Inc. v. RI*, 418 F.3d 36, 46 (1st Cir. 2005) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become a matter of idle curiosity."). The rationale is that "'[w]ithout such a substantial indication [of likely success on the merits], 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *AFGE*, 104 F. Supp.2d at 64 (quoting *Am. Bankers Ass'n v. NCUA*, 38 F. Supp.2d 114, 141 (D.D.C. 1999) (quoting *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977))).

adversary to do something (a mandatory injunction) or an injunction which forbids the adversary to do something (a prohibitive injunction). *See PACCAR, Inc. v. Telescan Techs., LLC*, 319 F.3d 243, 249 n.4 (6th Cir. 2003) (citing *United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg. Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998)), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

The failure to show any likelihood of success on the merits – let alone a strong or substantial likelihood of success – is enough, by itself, to warrant denial of preliminary

---

*Accord Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 849 n.52 (N.D. Ill. 1987) ("[T]he merits inquiry may be viewed as the most critical. [A] failure on that score is immediately fatal to plaintiff.") (citing *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 580 (7th Cir. 1981)); *San Miguel v. DPW*, 2008 WL 541150, *5 (S. Ct. Guam Terr. Feb. 20, 2008).

Our Circuit has not yet expressly called the likelihood of success on the merits the *sine qua non* of preliminary injunctive relief. It has held, however, that it was not error to dispense with analysis of the other three factors where the movants made a weak showing on the merits:

> Because the district court found . . . that the plaintiffs did not have a substantial likelihood of success on the merits . . . [it] did not make findings on the record with respect to the remaining three factors to be considered when determining whether a [PI] should issue. Since the district court apparently considered that the failure of the plaintiffs to show a likelihood of success on the merits was significant enough to prevent the injunction from issuing, the additional findings were not necessary. *See generally American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. . . .*, 963 F.2d 855, 862 (6th Cir. 1992) (stating that the district court is not required to make findings on factors that are not dispositive with respect to the issuance of a [PI]); 11A [Wright, Miller, and Kane], FEDERAL PRACTICE & PROCEDURE § 2948.3, at 184-188 (2d ed. 1995) (noting that the plaintiff must generally show at least some probability of success on the merits in order to obtain a [PI]).

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (¶ break added). *See also Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) ("[A] district court is not required to make specific findings concerning each of the four factors used [in federal courts] in determining a motion for [PI] if fewer factors are dispositive of the issue."). For a summary of all the circuits' standards for PI relief, *see Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363-67 (Fed. Cir. 2008) ("All of the circuits have placed the [PI] in terms of the likelihood of success on the merits and equitable factors. No circuit has held that it suffices simply to raise a 'substantial question.'").

injunctive relief.  *See Abbey v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) ("a finding of no

likelihood of success 'is usually fatal'") (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225

F.3d 620, 625 (6th Cir 2000)).


### Plaintiff MEI's Application for a Preliminary Injunction

<u>Likelihood of Success on the Merits of the Lanham Act Trademark-Infringement Claims.</u>

Like the parties' briefs, the court's analysis focuses on MEI's two federal claims.  Count

one, Trademark Infringement, claims that B360 and the Scripps Defendants deliberately

infringed the Bitchen Kitchen trademark in violation of Lanham Act section 32(1) (codified at 15

U.S.C. § 1114(a)) by using both that mark and the confusingly-similar Bitch*in'* Kitchen mark, in

a way that is likely to confuse or deceive consumers as to the origin, sponsorship or approval of

their products, "trading on the goodwill associated with Plaintiffs and The Bitchen Kitchen

Mark, *see* Comp ¶¶ 104-106.  Count two, False Designation of Origin / Federal Unfair

Competition, claims that B360 and the Scripps Defendants deliberately falsely represented or

designated the origin of their products as originating from or being connected with the plaintiffs,

with the purpose and effect of confusing consumers and trading on the goodwill associated with

plaintiffs and their trademark, *see* Comp ¶¶ 111-112.  On each count, MEI claims that it has no

adequate remedy at law and that the federally unlawful conduct will continue until and unless

enjoined, *see* Comp ¶¶ 107-108 and 113-114.  MEI explains its theory of the case as follows:

> This is not an ordinary trademark infringement case, where a newcomer to the market
> knocks off a senior user's brand in the hopes of making a sale.  The facts in this case are
> those of "reverse confusion," which occurs when a larger, more powerful company uses
> the trademark of a smaller, less powerful senior owner and thereby causes confusion as to
> the source of the senior user's goods or services.  In these types of cases, the junior user
> saturates the market with a similar trademark and overwhelms the senior user.  The

> public assumes that the senior user's products are really the junior user's or that the former has become somehow connected to or affiliated with the latter. The senior user comes to be viewed by the consumers as an infringer of its own mark. The senior user risks losing its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets. In spite of its superior rights, reverse confusion imperils the senior user, wh[ich] usually faces a fight it cannot afford.

Opening Brief in Support of Plaintiffs' Application for Preliminary Injunction filed February 8, 2011 ("PI") at 1-2; *see also* PI at 21 (quoting, to the same effect, *Ameritech v. American Info .Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987) and citing *Pharmacia & Upjohn Co. v. Generation Health*, 1997 WL 750605, *10 (W.D. Mich. July 15, 1997) (Wendell Miles, J.) ("'Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks.'") (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 474 (3d Cir. 1994))). MEI alleges that it and Defendants "market and provide or sell a number of the same items, in the same way, to the same consumers, using the same brand", PI at 3. MEI's expressed fear is that

> consumers will believe that they infringe Defendants' brand, not the other way around. Although Plaintiffs were first to use the Bitchen Kitchen mark, given the widespread use of the Bitchin' Kitchen mark by Defendants, consumers may believe that Plaintiffs are late to market and are trying to capitalize on the newly-broadcast television show. Additionally, Defendants' use of Plaintiffs' The Bitchen Kitchen Mark and other confusingly similar marks is likely to confuse – and even worse has confused – consumers into believing that Plaintiffs are somehow affiliated with Defendants, or that Plaintiffs have otherwise sponsored, approved of, or endorsed Defendants' products or services that bear Plaintiffs' The Bitchen Kitchen Mark. Such an inference is false and harms Plaintiff's reputation and renown with its loyal customer base.

PI at 18.

    To prevail on its federal trademark-infringement claims, MEI and Rapp ultimately must prove to the factfinder that their Bitchen Kitchen mark is valid, that the defendants are using that

mark without consent, and that the unauthorized use is likely to cause confusion among the public.
*See Nagler v. Garcia*, 370 F. App'x 678, 680 (6th Cir. 2010) (Merritt, Cook, <u>Kethledge</u>) (citing

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)). "The third factor is the most

important, and asks 'whether the defendant's use of the disputed mark is likely to cause confusion

among consumers regarding the origin of the goods offered by the parties.'" *Nagler*, 370 F. App'x

at 680 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy Family Music Ctr.* 109 F.3d 279,

280 (6th Cir. 1997)).[11]

As for count two, the plaintiffs' claim for trademark infringement under the rubric "False

Designation of Origin / Federal Unfair Competition", they ultimately need to establish that the false

designation had a substantial effect on interstate commerce and that the false designation creates a

likelihood of confusion, *see Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, 2009 WL 3199882,

*9 (E.D. Mich. Sept. 30, 2009) (citing *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998)).

The statutory analysis of the merits of MEI's two federal claims is governed in the first

instance by section 33 of the Lanham Act, 15 U.S.C. § 1115, which is entitled "Registration on

Principal Register as Evidence of Exclusive Right to Use Mark; Defenses." Subsection (a), entitled

Evidentiary Value & Defense, provides as follows:

> Any registration issued under the Act of March 3, 1881, or the Act of February 20, 1905, or
> of a mark registered on the principal register provided by this chapter and owned by a party
> to an action shall be admissible in evidence and shall be prima facie evidence of the validity

---

[11]

As a matter of law, our Circuit has held that "'it is unlikely that the presence of another's
trademark in a post-domain path of a URL would ever violate trademark law.'" *Nagler*, 370 F.
App'x at 680 (quoting *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 327 F.3d 687,
698 (6th Cir. 2003)) (where plaintiff-physician owned trademark of weight-loss system called "Diet
Result", panel held that defendant did not commit trademark infringement in violation of 15 U.S.C.
§ 1115(a) by website which did not mention the Diet Results weight-loss program but had a page
at the address www.beautyinaflash.com/dietresults.html).

of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein,

but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a) (paragraph break added). Therefore, it is undisputed that the federal registration of Rapp's Bitchen Kitchen mark as a trademark constitutes prima facie evidence that the mark is valid, that Rapp owns the mark, and that Rapp (and her licensee) have the exclusive right to use the mark in commerce on types of goods and services specified in the registration (or "in connection with" those types of goods and services).

In determining whether the use of the allegedly infringing mark is likely to cause confusion among consumers regarding the origin of the goods or services offered by the parties, a court in our circuit must consider eight factors to the extent that they apply: (1) the strength of the plaintiff's mark; (2) the relatedness of the plaintiff's goods or services to the defendant's goods or services; (3) the similarity of the marks; (4) evidence that consumers have actually been confused; (5) the marketing channels used; (6) the likely degree of consumer care; (7) the defendant's intent in selecting its mark; and (8) the likelihood that the defendant will expand the product lines which use the allegedly infringing mark. *See GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citing *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 (6th Cir. 2005)). "The factors for determining likelihood of confusion for a claim under Section 1125(a)", like the plaintiffs' count one, "are identical to those for a trademark infringement claim under Section 1114.", like the plaintiffs' count two. *See Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, 2009

WL 3199882, *9 (E.D. Mich. Sept. 30, 2009) (citing *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 195 F. Supp.2d 1024, 1030 (S.D. Ohio 2001)).

These factors do not imply mathematical precision, but rather are merely a guide to determine whether confusion is likely under all the circumstances, *Lanard Toys*, 468 F.3d at 412 (citing *Gibson Guitar Corp.*, 423 F.3d at 548 (citing *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991))). "While not all of the factors are relevant in every case," *Innovation Ventures, LLC v. N.V.E., Inc.*, No. 08-11867, – F. Supp.2d –, –, 2010 WL 3743652, *12 (E.D. Mich. Sept. 15, 2010), "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way", *Therma-Scan*, 295 F.3d at 630.

**On the first of the eight *Frisch* likelihood-of-confusion factors, the strength of MEI/Rapp's Bitchen Kitchen Mark,[12]** the court ordinarily focuses on "the distinctiveness of [the] mark and its recognition among the public." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002). The strength of a mark is generally the result of its unique nature, its owner's intensive advertising efforts, and which of four categories it occupies (generic, descriptive, suggestive, or arbitrary/fanciful, the last of which is the strongest), *Therma-Scan*, 295 F.3d at 631. Our Circuit defines the four types of mark as follows:

A "fanciful" mark is a combination of letters or other symbols signifying noting other than the product or service to which the mark has been assigned (e.g., Exxon, Kodak). An

---

[12]

The court considers only the strength of the plaintiff's mark to determine whether it is deserving of protection, not the strength of the defendant's allegedly-infring*ing* mark. *See Ignition Athletic Performance Group, LLC v. Hantz Soccer USA, LLC*, 2007 WL 2049005, *4 (E.D. Mich. July 17, 2007) (citing, *inter alia*, *Therma-Scan*, 295 F.3d at 630, and *Daddy's Junky Music*, 109 F.3d at 280).

"arbitrary" mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached (e.g., Camel cigarettes or Apple computers). Fanciful and arbitrary marks are considered to be the "strongest" or most distinctive marks. Encroachment on a strong mark tends to produce the greatest likelihood of confusion.

"Suggestive" and "descriptive" marks either evoke some quality of the product (e.g., EasyOff, Skinvisible) or describe it directly (e.g., SuperGlue). Such marks are considered weaker, and confusion is said to be less likely to where weaker marks are involved.

*Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). To review, of the four categories, generic and descriptive are the weakest. A suggestive mark, which suggests rather than describes the ingredients or components or characteristics of a good or service – requiring the listener or observer to use imagination, perception or inference to determine the nature of the goods – is stronger than a mark which is merely descriptive, and does not require proof of a secondary meaning, *see Express Welding*, 700 F. Supp.2d at 798 (citing *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.* 78 F.3d 1111, 1117 (6th Cir. 1996)). Arbitrary or fanciful marks are the strongest of the four mark categories, *Express Welding*, 700 F. Supp.2d at 798.

Unlike Exxon or Kodak, *Little Caesar*, 834 F.2d at 571, plaintiff Rapp's "Bitchen Kitchen" mark is not a symbol signifying noting other than the product or service to which the mark has been assigned, i.e., it is not "fanciful", the strongest category. Unlike Apple Computers or Camel Cigarettes, *Little Caesar*, 834 F.2d at 571, plaintiff Rapp's "Bitchen Kitchen" mark does not have some significance recognized in everyday life which nevertheless is unrelated to the product or service to which the mark is attached, i.e., it is not "arbitrary", the other very strong type of mark; the phrase "Bitchen Kitchen" certainly is related to the type of products which are marketed and sold under that mark, i.e., cooking and kitchen products. Rather, plaintiff Rapp's "Bitchen Kitchen" mark is best characterized as "suggestive", like EasyOff or Skinvisible, *Little Caesar*, 834 F.2d at

571, because it evokes some quality of the products, i.e., that they are "bitchin', meaning cool or hip and desireable. Finally, "Bitchen Kitchen" probably should not be characterized as a "descriptive" mark, like SuperGlue, because it does not describe the products directly. Thus, the Bitchen Kitchen mark is of one of the weaker types.[13]

Most – though not all – of the other *Frisch* likelihood-of-confusion factors favor the plaintiffs' case on the merits. Thus far it seems that the plaintiffs will likely make a strong showing on the second factor – as to defendant B360 - because there is uncontroverted evidence that B360's Bitchin' Kitchen mark is used to sell goods very similar to those sold under the plaintiffs' Bitchen Kitchen mark: aprons, cutlery, cooking/recipe books or magazines, and other kitchen and cooking implements and related knick-knacks.

**The plaintiffs are also likely to make a very strong showing on the third *Frisch* factor,** the similarity of the marks, because the Bitchin' Kitchen and Bitchen Kitchen marks are, at least

---

[13]

If the Bitchen Kitchen mark survives five years without being successfully challenged, it will become a so-called incontestable mark  *See Volkswagen AG v. Dorling Kindersley Pub., Inc.*, 614 F. Supp.2d 793, 802 (E.D. Mich. 2009) (citing *Daddy's Junky Music Stores*, 109 F.3d at 282 (citing 15 U.S.C. § 1065)). The PTO published "The Bitchen Kitchen" mark for opposition on June 12, 2007, and issued the federal registration to plaintiff Rapp for that mark on August 28, 2007, *see* Comp ¶¶ 24-25 and http://tess2.uspto.gov/bin/showfield?f=doc&state=4002:pvlr40.2.1 (PTO website search for Serial Number 78838030 leading to Registration Number 3285907).

Accordingly, by operation of law, the "The Bitchen Kitchen" registered trademark will become an incontestable mark if it is not successfully challenged by five years from the date on which it was published for opposition, i.e., on June 12, 2012. At that point, about fourteen months from now, the plaintiffs will be able to avail themselves of the rule that "[a]n incontestable mark 'is presumed to be . . . a relatively strong mark.'" *Dorling Kindersley Pub.*, 614 F. Supp.2d at 802 (citing *Daddy's Junky Music Stores*, 109 F.3d at 282). But that does not help the plaintiffs right now.

textually, almost identical.  They are so close to textually identical, in fact, that when one searches for one of the terms with an internet search engine, each search engine used asks something to the effect of "Did you mean [the other term]?" and/or states "We have included results for [the other term]."  Even apart from the implication of these search-engine results and responses, a factfinder could very readily find that "the sound, sight and meaning" of the two marks is quite confusingly similar, *see* 4 McCarthy on Trademarks § 23:21.  The court determines that a reasonable factfinder could find that the differences in "the pronunciation, appearance, and verbal translation" of the two marks, *Victoria's Secret Stores, Inc. v. Artco Equip. Co., Inc.*, 194 F. Supp.2d 704, 727 ()S.D. Ohio 2002), are *de minimis* compared to their extreme similarities so far as the text of the marks goes. *See* 4 McCarthy on Trademarks § 23:20 ("When there are small differences between the marks, the differences may be *de minimis* when compared to the similarities.").  After all, Bitch*in'* Kitchen looks almost exactly the same, sounds almost exactly the same, and would customarily be understood to mean *precisely* the same thing as Bitch*en* Kitchen.  As for the meaning of B360's mark, B360 itself opined to the PTO that "BITCHIN' KITCHEN means cool kitchen", Comp Ex E (B360's response to PTO Office Action), which again is precisely what a consumer familiar with the slang term "bitchin'" would take plaintiff Rapp's "Bitchen Kitchen" to mean.

On the other hand, the ultimate determination of the similarity of the marks will entail consideration of more than just the words used in the marks.  Specifically, the parties should advise the court of the sizes, fonts, colors, shapes, graphics or other visual or textual elements which they believe render the two marks more similar or less similar in the eyes of the typical consumer.  *See, e.g., Innovation Ventures, LLC v. N.V.E., Inc.*, No. 08-11867, – F. Supp.2d –, –, 2010 WL 3743652, *13 (E.D. Mich. Sept. 15, 2010) (in finding that defendant's "6 Hour POWER" mark was not

confusingly similar to plaintiff's "5-Hour ENERGY" mark, court reasoned in pertinent part that "The only word shared by both marks is the word 'hour', which is the least prominent word on each mark. The fonts are also very different when viewed as they appear in the marketplace; 5-hour ENERGY is italicized, written in black , and outlined with a yellow shadow line, while 6 Hour POWER is not italicized, contains no hyphen between 6 and Hour, and is not outlined with any shadow.") (internal citation omitted). Moreover, in determining the degree of arguably confusing similarity between the two marks, the court would also benefit from knowing whether each of the marks (whether on a product itself or in a program or advertisement) is typically accompanied by another mark or feature which would help a reasonable consumer distinguish it from the other mark. *See Innovation Ventures*, – F. Supp.2d at –, 2010 WL 37436562 at *13 (in finding that defendant's "6 Hour POWER" mark was not confusingly similar to plaintiff's "5-Hour ENERGY" mark, reasoning in pertinent part that "the 6 Hour POWER mark is prominently preceded by Defendant's registered trademark, STACKER 2, thus lessening the potential for confusion") (citing *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1441 (S.D. Ohio 1990) ("The house mark of a company tends to de-emphasize the contested mark as a source of the goods or services.") (citing *Frisch's*, 759 F.2d at 1265)).

**It is unclear whether the plaintiffs will ultimately make a strong case on the fourth *Frisch* factor, evidence of actual consumer confusion between the two marks, though it appears that they *will* be able to do so.** On one hand, the plaintiffs have presented evidence that one or two specific consumers were actually confused by the high degree of similarity between their Bitchen Kitchen mark and defendant B360's Bitchin' Kitchen mark. But in fairness to the defendants, our Circuit has cautioned that while evidence of specific instances of actual confusion

is certainly probative of the general likelihood of confusion between the marks, "it does not follow that any type of quantum of such evidence is entitled to significant weight in the determination," *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991). Indeed, if the plaintiffs ultimately fail to present additional evidence of specific instances of consumer confusion between their mark and B360's Bitchin' Kitchen mark, this factor could cut the other way. "[T]he existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective may even lead to an inference that no likelihood of confusion exists." *Homeowners*, 931 F.2d at 1110. And "[p]erhaps as important as the number of instances of confusion are the kinds of persons confused and [the] degree of confusion. 'Short-lived confusion or confusion of individuals casually acquainted with a business [are] worthy of little weight,' while chronic mistakes and serious confusion of actual customers are worthy of greater weight." *Homeowners*, 931 F.32d at 1110 (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (internal citation omitted)). Here the specific customer whom the plaintiffs present as confused between the two marks was apparently a regular customer of Rapp's Bitchen Kitchen store, rendering her confusion worthy of significant weight.

**At least equally important is the fact that the PTO itself has found a likelihood of consumer confusion between the registered The Bitchen Kitchen mark and defendant B360's proposed Bitchin' Kitchen mark.** The ongoing suspension of B360's proposed mark is noted. However, that fact does not dissuade the court from considering the PTO's initial position. It has been said that a PTO examining attorney's finding on this score is not binding on the court, *see Sara Lee Corp. v. American Leather Prods., Inc.*, 1998WL 433764, *15 (N.D. Ill. July 29, 1998)

(Pallmyer, U.S.M.J.) ("[A]n opinion by an examining attorney during the application process is not binding in court on an adversarial proceeding.") (citing *H. Sichel Sohne, GmbH v. John Gross & Co.*, 204 U.S.P.Q. 257, 261 (PTO-TTAB Aug. 30, 1979) (citing *John B. Stetson Co. v. Globe Rubber Works, Inc.* 180 U.S.P.Q. 655 (PTO-TTA Bd. 1973) and *Formica Corp. v. Saturn Plastics Engineering Co.*, 185 U.S.P.Q. 251 (PTO-TTA Bd. 1975))).

The court finds it logical to accord some weight to the PTO's determination, particularly where the remainder of the record as it stands does not militate in favor of the opposite view. As a sister court put it in a trademark-infringement case,

> [A]n initial determination of issues central to this case was made by an examining attorney at the PTO during consideration of Defendants' application. While not binding on us here, we nonetheless believe the examining attorney's decision deserves our [sic] full consideration. We are guided by the well established rule of *Morgan v. Daniels*, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894), which held:
>
>> [W]here the question decided in the Patent Office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon the question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction . . . . [I]f doubtful the decision of the Patent Office must control.
>
> *Id.* [153 U.S.] at 125, 14 S.Ct. at 773. The rule of *Morgan v. Daniels*, has more recently been reaffirmed in the Third Circuit and elsewhere. *See Radio Corp. of America v. International Stand E. Corp.*, 232 F.2d 726, 729 (3d Cir. 1956) (acknowledging strict injunction laid down by *Morgan v. Daniels*, that the patent office's finding is not to be disturbed unless there is "thorough conviction" that a mistake has been made); *s. & S. Corrugated Paper Mach. Co. v. George W. Swift, Inc.* 176 F.2d 358, 360 (3d Cir. 1949); *Standard Oil Co. v. Montedison*, 664 F.2d 356, 362 (3d Cir. 1981) . . . ; *Stamicarbon, N.V. v. Chemical Const Corp.*, 544 F.2d 645, 647 (3d Cir. 1976); *Miles Shoes, Inc. v. R.H. Macy & Co., Inc.*, 199 F.2d 602, 602 (**2d Cir.** 1952) . . . . *Contra John Morrell & Co. v. Doyle*, 97 F.2d 232, 235 (7th Cir. 1938) . . . .

It is true that the case before us is one of alleged trademark infringement in violation of §§ 32 and 43 of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and not – as was their case in

-36-

> *Morgan v. Daniels* – a question of patent priority. Nonetheless, the principle laid down in *Morgan* is equally applicable to trademarks. *Century Distilling Co. v. Continental Distilling Co.*, 106 F.2d 486, 489 (3d Cir. 1939) . . . (citing **United States ex rel. Baldwin Co. v. Robertson, 265 U.S. 168, 45 S.Ct. 508, 68 L.Ed. 962 (1924)**).

*A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 926 F. Supp. 1233, 1254-55 (E.D. Pa. 1996) (Van Antwerpen, J.) (boldface added) (denials of *certiorari* omitted)

**The plaintiffs so far make a reasonably strong case on the fifth *Frisch* factor, contending plausibly that they and the defendants use similar marketing channels to reach the same or similar consumers.** This factor considers "how and to whom the respective goods or services of the parties are sold", *Homeowners Group*, 931 F.2d at 1110. The plaintiffs need not prove that they are in direct competition with the defendants, and their lines of business need not be exactly the same, so long as their products are the kind which the public could attribute to a single source, *see TV Land*, 908 F. Supp. at 551. The Scripps Defendants present a strong argument that they do not provide products of the same kind as the plaintiffs provide for this purpose. Indeed, the Scripps Defendants present ample uncontested affidavit testimony averring that they do not allow the Bitchin' Kitchen personalities or their own personnel to sell *anything* directly on B360's cable television show which runs on their Cooking Channel.

There is strong and thus-far uncontested evidence, by contrast, that defendant B360 sells very much the same kind of products as the plaintiffs, such that a reasonable consumer could become confused and erroneously attribute the goods sold under both marks to a single source. It is wholly unpersuasive for B360 to evade this fact by asserting, as it did several years ago before the PTO, that its target audience is dramatically different from the plaintiff's customer base because it (B360) directs its goods to "fans of Nadia G and the online television series [podcast], typically young

adults with Internet and/or mobile video access", Comp Ex E (B360 response to PTO Office Action). If that claim were plausible in 2008, which is not even clear, it certainly does not hold water today, in 2011. Until and unless B360 presents competent evidence to the contrary, the court will not assume that only or even predominantly "young adults", rather than the vast general population of nearly all ages, has and regularly uses access to the Internet and to video through home and office computers of both desktop and laptop varieties, cellular telephones ("smartphones"), "tablets" such as the iPad series and its competitors, etc. Moreover, B360 has long since expanded its Bitchin' Kitchen programming, advertisement, and marketing channels far beyond those early podcasts, such as to the widely-viewed Cooking Channel cable television series, which consumers can view even if they do not have, or do not regularly use, Internet access. Finally, both the plaintiffs and defendant B360 use their online stores, social-networking sites such as Facebook and MySpace, and sponsored links on search engines, to find and retain customers. It appears very likely that the plaintiffs will be able to convince a factfinder that their potential customer pool, their products, and their marketing channels, are sufficiently similar to defendant B360's to bolster the finding that consumers are likely to be confused by the concurrent use of the two very similar marks.

**As for the sixth *Frisch* factor,** the defendants have not yet mounted a particularly persuasive response to the plaintiffs' contention that consumers in the market for kitchen implements and cooking and recipe items are not likely to exercise a high degree of care as to the origin of the products which they purchase. This is particularly true to the extent that the products sold by the plaintiffs and the defendants tend not to be extremely expensive, contrast *Express Welding, Inc. v. Superior Trailers, LLC*, 700 F. Supp.2d 789, 797 (E.D. Mich. 2010) ("The sixth *Frisch's* factor, the likely degree of consumer care, is the weakest part of plaintiff's assertion of likelihood of confusion.

The [truck] trailers in question are expensive, and the purchasers of expensive products are likely to exercise a high degree of care.") (citing *Leelanau Wine Cellars*, 502 F.3d at 519).  (The defendants may, of course, persuade the court otherwise in the future (on a motion for summary judgment) or eventually persuade the factfinder to the contrary at trial, but it does not seem likely on the current record and with the current briefs alone.  To make a fully informed determination on this six factor, then, the court or jury ultimately would benefit from evidence regarding the average, mean or typical price of items sold by the plaintiffs through the Bitchen Kitchen store and/or with the Bitchen Kitchen mark affixed, as well as the average, mean or typical price of the items sold by defendant B360 through the Bitchin' Kitchen show and website and/or with the latter mark affixed.

**As for the seventh *Frisch* factor,** plaintiffs MEI and Rapp present some evidence from which a factfinder could readily conclude that defendant B360 chose the Bitchin' Kitchen mark in order to capitalize unlawfully on the goodwill and brand reputation and recognition which the plaintiffs had earlier built for the nearly-identical Bitchen Kitchen mark.  The plaintiffs do this, in part, by submitting evidence from which a reasonable factfinder might show dishonesty and therefore support an inference of bad faith and unlawful intent underlying defendant B360's choice of the mark Bitchin' Kitchen.  First, in both B360's Canadian trademark application and its American trademark applications, it alleged that it had first used the Bitchin' Kitchen mark on those types of goods and services on June 1, 2002, the same exact date of first use claimed by plaintiff Rapp in her U.S. trademark application, *see* Comp ¶¶ 61-62 and Comp Ex L, but B360 stated in a press release and in a Nadia G biographical summary that the Bitchin' Kitchen Canadian cable series did not begin until 2007, *see* Comp ¶ 63 and Comp Ex B (Nadia Giosia biographical summary) and Comp Ex C (press release)).

The second piece of evidence which a reasonable factfinder could take to support an inference of bad faith and intent to "piggyback" on Rapp's senior mark is B360's use of the mis-spelling "Bitchen Kitchen" in place of its own "Bitch*in'* Kitchen" in a sponsored search-engine link, so that the link's underlying text read "Bitch*en* Kitchen Every Wednesday at 10:30 pm on Cooking Channel – Don't Miss It!" and included a link to the defendants' domain www.cookingchannelTV.com, *see* Comp ¶¶ 95-96 & 98 and PI Ex 7 (search-engine results from day of PI motion's filing in February 2011) and Comp Ex Q (B360's sponsored link on www.google.com advertising the Bitchin' Kitchen TV show before its premiere on the Cooking Channel in the USA). A reasonable factfinder might well disbelieve any claim that the defendants accidentally mis-spelled their own mark in a major advertisement (a sponsored link on a very widely used search engine), finding instead that the mis-spelling was intentional – and, in turn, that the very choice of a mark that is textually, aurally, and substantively effectively identical to an older, established, successful mark was intentional as well.

A third piece of evidence which a reasonable factfinder could take to support an inference of bad faith and intent (by 360, not by the Scripps Defendants) to infringe on Rapp's rights to its senior mark is the undisputed fact that defendant B360 continued to use its very similar mark – and aggressively expanded its use of that mark – after knowing that the senior mark existed and being clearly advised Ms. Rapp that its continued use would confuse consumers and harm the senior user (B360's president's conversations and correspondence with Rapp).

Defendant 360 counters that no response to their letter was made by plaintiffs allowing a permissible conclusion that as between 360 and Ms. Rapp the issue was settled. However, 360 expanded the contours of the use of the mark thereafter, lessening its reliance on the non-response

of plaintiff.

In our circuit, "use of a mark with knowledge of another's prior use of a mark supports an inference of intentional infringement." *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 603 with n.5 (6ᵗʰ Cir. 1991) (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 119 F.2d 316, 324 (6ᵗʰ Cir. 1941) (intent to deceive the public will be presumed from continued use after obtaining knowledge of another's legal mark), *rev'd on other grounds*, 316 U.S. 203 (1942) and *Koffler Stores, Ltd. v. Shopper's Drug Mart, Inc.*, 434 F. Supp. 697, 703-704 (E.D. Mich. 1976), *aff'd w/o op.*, 559 F.2d 1219 (6ᵗʰ Cir. 1977) and *Empire Nat'l Bank of Traverse City v. Empire of America FSA*, 559 F. Supp. 650, 657 (W.D. Mich. 1983) (Hillman, J.)).  The fact that B360's president allegedly agreed to limit his company's use of the Bitchin' Kitchen mark to Canada strongly suggests that he knew or believed that that mark posed a substantial risk of consumer confusion and attendant harm to the holder of the senior mark.

A fourth piece of evidence which a reasonable factfinder could take to support an inference of bad faith and intent to infringe by B360 is the fact that it continued using is mark after learning that Rapp had acquired federal trademark registration for her very similar mark.  *See Atrezzi LLC*, 436 F.3d at 40 (where a defendant is "well aware of a substantial risk of confusion and nonetheless decide[s] to gamble" by continuing to use its similar mark, a court may find intentional infringement); *Daddy's Junky Music Stores*, 109 F.3d at 286; *Nat'l Customer Eng'g, Inc. v. Lockheed Martin Corp.* 43 U.S.P.Q. 1036 (C.D. Cal. 1997).

**As for the eighth and last *Frisch* likelihood-of-confusion factor,** the likelihood that the defendant will expand the product lines which use the allegedly infringing mark, plaintiffs MEI and Rapp again have presented a strong case thus far.  Since creating the Bitchin' Kitchen mark, and

even since being strenuously advised of the extreme and arguably confusing similarity between that mark and Rapp's Bitchen Kitchen mark, defendant B360 has vastly expanded the reach of the mark and the products and programming offered either bearing the mark or under its auspices and brand reputation. B360 inaugurated first the Canadian television show featuring Nadia Giosia under the Bitchin' Kitchen moniker, then the American television show featuring the same, apparently to great popular and commercial success. A wide range of kitchen and cooking implements and souvenirs, including the widely-sold cookbook, have been sold and apparently continue to be sold in substantial numbers through Bitchin' Kitchen's online store – though apparently not directly and explicitly through the American cable television series itself.

In the event that the court finds the likelihood-of-confusion factors to be roughly in equipoise, the plaintiffs advance the notion that any doubt about the likelihood of confusion must be resolved in favor the senior user, here MEI / Rapp. *See* PI at 22. For this proposition, however, the plaintiffs cite no precedential authority, only an ancient district-court decision from the Second Circuit, albeit from a renowned jurist, and a treatise, albeit a widely cited treatise. *See Lambert Pharmacal Co. v. Bolton Chem. Corp.*, 219 F. 325 (D.N.Y. 1915) (Learned Hand, J.) And 4 McCarthy on Trademarks § 23:64 ("the rule of resolving doubt in favor of the senior user is a tie-breaker."). One Sixth Circuit panel mentioned *a district court's* assertion that "[w]here [a party] knew of the sr. mark and nevertheless proceeded to adopt a similar mark, he assumes a risk, and all doubt should be resolved in favor of the senior user", *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 366 (6th Cir. 1984), but the panel expressed neither approval nor disapproval of that assertion. Rather, the panel went on to base its decision on its determination that "the record does not support a finding that IOM had knowledge of Inductotherm's trademark when IOM adopted its

name", *Inducto-O-Matic*, 747 F.2d at 366.[14] This court has not located any Supreme Court or Sixth Circuit Court of Appeals decision which holds, states in dictum, or even implies that any doubt about the likelihood of confusion must be resolved in favor of the senior user of a mark.

Moreover, even if that tie-breaking rule were the law in our circuit, it would not be of any avail to the plaintiffs on a motion for preliminary injunctive relief. Such relief is "extraordinary" and is to be granted only upon a showing that the plaintiffs have a *strong* or *substantial* likelihood of success on the merits of their claims, in this case federal trademark infringement and related unfair-competition / designation-of-origin claims. If the likelihood-of-confusion analysis left such doubt that the court had to resort to an artificial legal presumption to break the tie in the senior user's favor, the senior user might well survive summary judgment on that basis – but it could not be said that the senior user had the requisite *strong* or *substantial* likelihood of ultimately convincing the factfinder that the junior user's mark tends to confuse consumers.

**On balance, then, if the court considered only the *Frisch* likelihood-of-confusion factors, it would be inclined to find that the plaintiffs are likely to succeed in showing likely confusion, and likely to succeed overall on the merits of their two federal trademark claims *against B360*. The Scripps Defendants, however, marshal a colorable argument that it is inappropriate to enjoin them from running B360's Bitchin' Kitchen show on its Cooking Channel because of its title would impermissibly impair their First Amendment freedom of speech.[15]**

---

[14]*Cf. Duer v. Corbin Cabinet Lock Co.*, 149 U.S. 216, 2233 (1893) ("Were the question of patentability one of doubt, this might suffice to turn the scale in favor of the patentee.") (citing no authority).

[15]

Alternatively, the Scripps Defendants contend that there is no evidence that they have

In seeking to enjoin defendants from continuing to air the Bitchin' Kitchen program with the current title and mark, plaintiffs MEI and Rapp rely heavily on the premise that "[w]here a television show and retail outlet have the same name, consumers believe that a single producer puts out both goods." PI at 25. On this score, the plaintiffs argue at length as follows:

> * * * "'[T]he rights of an owner of a registered trademark . . . extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.'" *McGraw-Edison Co. v. Walt Disney Prods.* 787 F.2d 1163, 1168 (7th Cir. 1986) (citations omitted). *The more similar the marks are, the less necessary it is that the products themselves [such as a television show versus a retail store and internet store selling products without the medium of a television show] be very similar to create confusion. Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006). * * *

> When presented with a reverse confusion case similar to the one at hand, the court in *TV Land* enjoined a television network from expanding its TV Land brand of programming to retail stores. *See TV Land*, 908 F. Supp. at 543 *et seq.* In *TV Land*, Plaintiffs were the owners of three retail stores in Chicago, which sold merchandise related to television programs using the "TV Land" trademark. *Id.* at 546.

> Thereafter, Defendant Viacom, the junior user, introduced the programming concept of "TV Land" mark on its Nickelodeon channel, and planned to market products using the "TV Land" mark at retail stores nationwide. *Id.* at 547. At the time, Nickelodeon was available in more than 50 million households nationwide. *Id.*

> In evaluating whether Defendants' goods and services were similar to those offered by Plaintiffs, the [c]ourt first looked to Defendants' intent-to-use trademark applications. As the [c]ourt noted:

>> The Defendants filed intent-to-use trademark applications for a host of goods and services that would compete directly with the goods and services that Plaintiffs offer. In fact, their intent-to-use applications suggest that they will use the mark "TV Land" on twenty-five types of products that Plaintiffs currently sel and on another twenty-five products that Plaintiffs may sell in the future. The Defendants intend to compete with the same products in the same market.

---

committed direct infringement of the plaintiffs' mark, *see* Scripps Defs' PI Opp at 7-11, or that they have committed contributory infringement of that mark, *see id.* at 11-13. Because the court holds that the plaintiffs are <u>not</u> strongly likely to defeat the Scripps Defendants' First Amendment defense to the requested relief, that alone requires denial of the PI as to the Scripps Defendants. The court need not reach their alternative arguments about lack of direct and contributory infringement.

*Id.* at 551.  In this case, Defendant B360 has filed intent-to-use applications for a plethora
of        goods and services that compete directly with Plaintiffs, which leads to the same conclusion:
Defendants intend to compete – and are competing – with many of the same products in the
same market as Plaintiffs.  *Id.*; *see also* Ex. 6 (Office Action listing paragraphs of
confusingly similar goods and services claimed in B360's application . . .).

Further supporting this conclusion is the fact that there is actual and significant overlap
between kitchenware products offered by B360 and those offered by Plaintiffs, including but
not limited to aprons, spatulas, cookbooks, and coffee mugs, among others.  Both Plaintiffs
and B360 offer recipes on their websites.  And, Plaintiffs sell products branded by other
Food Network personalities, such as Emeril Lagasse and Rachael Ray.  In light of the fact
that Plaintiffs' protectable trademark rights "extend to any goods related in the minds of
consumers in the sense that a single producer is likely to put out both goods," [*McGraw-
Edison Co.*, 787 F.2d at 1168 (7th Cir.)], the goods and services of both Plaintiffs and
Defendants are substantially similar.

Next, the Court noted that when branded with the same trademark, a television network and
retail store services are sufficiently similar to weigh in favor of a likelihood of confusion[:]

> For example, Warner Brothers offers entertainment services and retail outlets; the
> Walt Disney Company has the Disney Stores and the Disney Channel; [t]he
> Discovery Channel has the Discovery Channel Stores; and WTTW Television is a
> partner in the WTTW Store of Knowledge.  *At this point, consumers likely believe
> that, where a network and a retail outlet have the same name, a single producer puts
> out both goods.*

*Id.* at 551.  The [c]ourt concluded that Defendants' use was likely to confuse consumers,
enjoined Defendants from future uses of the phrase "TV Land" and prohibited them from
expanding their brand.  *Id.* at 555.

PI at 25-27 (citations for denials of certiorari omitted).  In the case *sub judice*, plaintiffs contend, the

defendants intend to market, offer and sell goods and services under the Bitchin' Kitchen mark

which are confusingly similar to those offered by the plaintiffs under the Bitchen Kitchen mark, PI

at 28.  From a consumer's perspective, the plaintiffs urge,

> because the marks in this case are virtually identical, there is little difference between use
> of the mark in connection with a cable series (as in this case) or a television network (which
> was the case in *TV Land*).  Neither of the parties in *TV Land* submitted evidence of online
> retail sales, or commercial advertising by the retail store on the television network.  The
> presence of additional facts here further supports the same conclusion reached by the court
> in the *TV Land* case: consumers will mistakenly believe that Plaintiffs' Bitchen Kitchen

business is somewhat connected or affiliated with, or endorsed or sponsored by Defendants' Bitchin' Kitchen brand.  * * *

PI at 28.

But be that as it may, the Scripps Defendants present binding precedent which makes it at least unclear whether this court could enjoin their continued airing of a show entitled "Bitchin' Kitchen" without impermissibly impairing their First Amendment rights.  Scripps points first to *Westchester Media v. PAL USA Holdings*, 214 F.3d 658 (5th Cir. 2000), where the owners of the "Ralph Lauren Polo" mark sought to enjoin the publication of a magazine about the sport of polo and the affluent lifestyle under the title "Polo."  The Fifth Circuit aptly summarized the tension which can arise in cases like these between the trademark owner's intellectual-property rights and the alleged infringer's First Amendment free-speech rights:

> In the usual Lanham Act case, the presence of a likelihood of confusion disposes of the issue of infringement.  But this case is not so simple.  PAL is not trying to enjoin a purely commercial use of the "Polo" mark.  Rather, it is trying to prevent Westchester from using "Polo" as a title for a magazine.  In so doing, PAL's infringement claim implicates the First Amendment right to choose an appropriate title for literary works.  *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 n.7 (5th Cir. 1999) (noting a First Amendment interest in choosing an appropriate book title); *Twin Peaks Productions, Inc. v. Publications Intel, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) (same).

> This case thus involves the tension between the protection afforded by the Lanham Act to trademark owners and the protection afforded by the First Amendment to expressive activity.  In *Rogers v. Garibaldi*, 875 F.2d 994 (2d Cir. 1989), the Second Circuit ruled that this tension could not be resolved by allowing the First Amendment to insulate titles of artistic works from Lanham Act claims.  *See Rogers*, 875 F.2d at 998.  But neither could courts ignore First Amendment concerns when enforcing the Lanham Act.  *Id.*  Titles, according to the *Rogers* court, combine both artistic expression and commercial promotion, and they consequently require more First Amendment protection than the labeling of ordinary commercial products.  *Id.*

> Finding that "overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values," *id.,* the court concluded that it "must construe the Lanham Act narrowly to avoid such a conflict."  *Id.* (Citing *Silverman v. CBS*, 870 F.2d 40, 48 (2d Cir.

1989); *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 494 (2d Cir. 1989).

*Westchester Media*, 214 F.3d at 664 (final paragraph break added). Our Court of Appeals expressly adopted this test in the published decision *Parks v. Laface Records*, 329 F.3d 437, 450 (6th Cir. 2003). (Under this test, "a title will be protected [against an intellectual-property claim] unless it has no 'artistic relevance' to the underlying work or, if there is artistic relevance, 'the title explicitly misleads as to the source or the content of the work.'" *Parks*, 329 F.3d at 448.)

On the first prong of the *Parks* test, the court determines that the Cooking Channel television show title "Bitchin' Kitchen" certainly has artistic relevance to the underlying work, that is, to the content, tone, style, purpose, and intended appeal of Nadia G's performance mixing comedic, informational, and titillating material and moods during the course of the show. Thus the defendants satisfy the first of the two criteria necessary to secure First Amendment protection in the face of Rapp's trademark and unfair-competition claims.

On the second prong of the *Parks* test, the waters are somewhat murkier. On the present record and briefs, it is not clear whether the plaintiffs will be able to establish that the title of the Bitchin' Kitchen TV show "explicitly misleads" the viewing public as to the source or the content of the program. The content of the show is defined in large part not by cooking *per se*, but by Nadfia Giosia's putative sex appeal and personality, described by the Scripps Defendants as "flashy, artistic, comedic" and fairly characterized generally as racy and suggestive. As viewers are immediately aware, on the show Giosia offers recipes ostensibly intended for weight loss (in an episode called Deflate Your Mate), breaking up with a paramour ("Splitsville Salad" on an episode entitled "Breakup Bonanza"), and impressing the in-laws (presenting wine pairings, filet mignon and "drunken peaches" as a way to accomplish this). *See* Scripps Defs' PI Opp at 4 (citing Ex D,

Bitchin' Kitchen Episode Guide). The Scripps Defendants make a colorable argument, which a reasonable factfinder could credit, that "[t]he Nadia G. character and the set of the program could not be more different from the tranquil Pentwater brick-and-mortar store described by Plaintiffs . . . ." Scripps Defs' PI Opp at 4 (quoting PI at 4-5). Moreover, the Scripps defendants state, without contradiction from the plaintiffs, that the Nadia G. character on the TV show never pitches kitchenware, nor do the Cooking Channel or Food Network websites carry any products linked to the program or its title and the associated mark. *See* Defs' Opp at 5 (citing Dukarski Dec ¶ 9, Smith Aff (Ex B) ¶ 4, and Ex F). In sum, when one puts the title of the show into the context of what viewers see and hear on the show and what they do not see and hear on the show, the defendants mount at least a colorable argument that the title "Bitchin' Kitchen" does not "explicitly mislead" viewers (or those who see its ads) about the content or source of the program, as the stringently pro-free-speech *Parks* standard requires to prohibit the use of a title on such a creative work.

Because the ultimate disposition of the First Amendment defense is not clearly dictated by any precedent which has been identified for or located by the court, nor by the facts of the case as they are known, the court cannot say that the plaintiffs have a strong likelihood of prevailing on their attempt to impose liability for (and permanently enjoin) the airing of the TV show with its present title. Preliminary injunctive relief, therefore, is not appropriate as to any defendant's conduct with respect to the TV show as it is for defendant B360's other conduct.


PI Factors 2-4: Irreparable Harm, the Balance of the Harms, and the Public Interest

The plaintiffs have amply demonstrated the irreparable harm which they will suffer – not merely loss of profits or market share, which are typically deemed compensable with money

damages following final judgment – but widespread consumer confusion causing grave harm to their brand reputation, identity and distinctiveness, and the customer loyalty and goodwill that are so closely dependent on and related to those qualities, *see Ameritech*, 811 F.2d at 964 – if B360 is permitted to continue using the nearly-identical mark, and on such a wide and growing scale. *See generally TV Land*, 908 F. Supp. At 554 ("there is no effective way to measure the loss of sales or potential growth – to ascertain the people who don't knock on the door or identify the specific persons who do not reorder because of the existence of the infringer.").[16] Conversely, the plaintiffs contend that defendant B360 could continue to aggressively market and profit from the Nadia G. brand which has become so well known and so popular, including continuing to broadcast her Cooking Channel show, simply under a different name. PI at 35. Moreover, the plaintiffs justly state, PI at 35, that B360 knowingly assumed the risk of any harm which it may suffer from being required to stop using what it *knew* to be essentially the plaintiff's mark.

On the other hand, the Scripps defendants emphasize that they will suffer great financial harm if the court orders them to stop airing B360's Bitchin' Kitchen TV program. Defendant Cooking Channel's general manager explains as follows:

> Bitchin' Kitchen runs in the 8-11 pm Prime Time block. Since its launch, the program has been one of the top three shows out of the approximately twenty programs in the Cooking Channel's prime[-]time lineup. Bitchin' Kitchen runs four episodes per week. During the week, Bitchin' Kitchen has over one million viewers[,] making it one of the most popular

---

[16]

The court need not get embroiled in the parties' dispute over whether proof of trademark infringement gives rise to a presumption of irreparable harm. *See* Scripps Defs' PI Opp at 19-20 (contending that such a presumption doctrine is in doubt in light of *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) (characterized as holding that no presumption of irreparable harm exists in context of permanent-injunction application in patent cases) and *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) (characterized as "extending the holding to preliminary injunction cases in general" and requiring the PI applicant to demonstrate that irreparable injury is likely in absence of such an injunction)).

shows on the network.

Advertising is sold on a network (not individual television show) basis. Customers for commercial advertising time purchase "impressions" for a negotiated price. A television shows delivers "impressions" depending upon its popularity as measured by the number of viewers tuning in. Nielsen Ratings provide[s] the estimate of the number of viewers who watch a show and, therefore, see the advertising run during that show. If a television show underperforms in the Nielsen Ratings, causing a network to fail to deliver the promised impressions to its advertising customers, the network will refund a portion of the price paid that is commensurate with the percentage of viewers missed. Our primetime block is important for advertising, as it comprises 70% of overall advertising revenue.

If Scripps were ordered to cease broadcasting Bitchin' Kitchen, we would have to replace it with another show. Because of Bitchin' Kitchen's popularity with viewers, its peremptory removal would create a loss of goodwill towards the brand and reputation of the Cooking Channel, as well as a loss of advertising revenue from being ordered to cease broadcasting this program. The loss of advertising revenue would be significant because of Bitchin' Kitchen's prominent location as a top performer in the prime[-] block. Replacing Bitchin' Kitchen with the best show outside the top twenty currently in the prime[-]time block would result in a loss of $80,000 of revenue per quarter. Over the course of the next two years of the license agreement with Tricon, the loss would be $640,000.

Smith Aff (Doc 21-2) ¶¶ 6-8.

At this juncture, without regard to whether the plaintiffs could make out the elements of

direct or contributory infringement by the Scripps Defendants, it does not appear that the plaintiffs

are likely to defeat the Scripps Defendants' persuasive argument that they will suffer substantial

financial harm if B360's Cooking Channel program is required to take on a new name and therefore

becomes less popular (a finding which the court cannot make at this juncture) or be replaced with

a less-popular show outright. The balance of the harms militates against preliminary injunctive

relief targeting the Scripps Defendants, who appear to stand in a materially different position than

B360 Media with regard to the infringement of the plaintiff's trademark rights because they have

never themselves sold or advertised products bearing the Bitchin' Kitchen mark or connected in the

consumers' mind with that mark.

Finally, the public interest generally presumptively favors the defendants' exercise of their constitutionally recognized freedom of speech in choosing a title for their television or podcast shows (B360) or in choosing to run such programs with the titles they or their contractual partners prefer (the Scripps Defendants). On the one hand, the public interest does not condone allowing intentional trademark infringers and unfair competitors to shelter behind the aegis of the First Amendment when it means dishonestly, drastically harming a senior mark owner who has labored for many years – before the junior user came onto the scene – to create and popularize the mark and to inform the broad public about the goods and customer service for which the user proclaims the mark to stand. Nor does the public interest favor legal protection for tactics which tend to confuse consumers about the origin of the good which they purchase with their hard-earned dollars. *See Eli Lilly & Co. v. Natural Answers, Inc.* 233 F.3d 456, 469 (7th Cir. 2000). But with no truly clear answer at this juncture to the second prong of the *Parks* test, the court cannot say that the public interest permits the drastic remedy of preliminarily enjoining the airing of the TV show with its present title "Bitchin' Kitchen." As our Court of Appeals declared when adopting the test to reconcile First Amendment rights with the statutory and common-law rights to intellectual property and fair competition, "*[t]he public has at least as much interest in the free exchange of ideas as it does in avoiding misleading advertising.*" *Parks*, 329 F.3d at 449. By definition, intellectual property includes the words, images, and sounds that we use to communicate, and the courts are strongly admonished not to "indulge in the facile assumption that one can forbid particular words" – such as the title of the Cooking Channel show at issue – "without also running a substantial risk of suppressing ideas in the process", *Parks*, 329 F.3d at 449 (citing *Cardtoons*, 95 F.3d at 971 (quoting *Cohen v. California*, 403 U.S. 15, 26 (1971)).

On the whole, at this early stage of the case, the court cannot justify running that risk by issuing the extraordinary remedy of preliminary injunctive relief against the Scripps Defendants. *See Westchester Media*, 214 F.3d at 672 (holding that publisher of Polo magazine was liable for infringement of Ralph Lauren's Polo mark, but also holding that the district court erred in enjoining the publisher to cease publishing the magazine with that title). Such relief is amply justified against B360, however, as to all conduct other than the title of its TV series.

### Requiring the Plaintiffs to Post a Bond to Secure this Partial Preliminary Injunction

So far as the court can make such a prediction, there appears to be little risk, under our Circuit's precedents and general principles of established trademark and unfair-competition law, that the Court of Appeals would vacate this court's issuance of preliminary injunctive relief against defendant B360. Accordingly, the substantial but partial relief today granted against defendant B360 does not warrant requiring the plaintiffs to post a bond to secure the instant injunction. Because the court is declining to preliminarily enjoin the Scripps Defendants in any respect, there appears to be little to no risk that the Court of Appeals would vacate or modify this decision in a way which relieves the Scripps Defendants of any legal obligation, restores some legal right to them, or otherwise directly financially benefits them. *See* Scripps Defs' Opp at 22, argument for requiring bond. On balance, the court in its discretion determines that the plaintiffs need not post a bond to secure this relief, to which they have demonstrated their legal and equitable entitlement.

The plaintiffs' application for a preliminary injunction [document #9] is **GRANTED in part and DENIED in part**. An Order filed contemporaneously with this Opinion shall issue.

This is not a final order, because it does not conclusively dispose of all issues as to all

parties.  Nonetheless, this order may be immediately appealable.  *See Stanton v. Hutchins*, 2010 WL 882822, *12 (W.D. Mich. Mar. 8, 2010) (citing *Overstreet v. Lexington-Fayette Cty. Urban Gov't*, 305 F.3d 566, 572 (6th Cir. 2002)) (citations omitted).[17] [18]

      **IT IS SO ORDERED** this 9th day of May, 2011.

                                      /s/ Paul L. Maloney
                                      Honorable Paul L. Maloney
                                      Chief United States District Judge

---

[17]

      To the extent that this order is appealable, the Court of Appeals will review this court's likelihood-of-consumer-confusion determination as follows: the likelihood of confusion is a mixed question of law and fact, with findings regarding the eight likelihood-of-confusion being factual matters (subject only to clear-error review) but the subsequent determination of whether these "foundational facts" establish a likelihood of consumer confusion being a legal conclusion (subject to *de novo* review), *see Lanard Toys*, 468 F.3d at 412-13 (citing *Gibson Guitar Corp.*, 423 F.3d at 548 n.11).

[18]

      "Generally, a panel entertaining a preliminary injunction appeal decides only whether the district court abused its discretion in ruling on the request for relief and does not go into the merits any further than necessary to determine whether the moving party established a likelihood of success." *Jones v. Caruso*, 569 F.3d 258, 269 (6th Cir. 2009) (citation to out-of-circuit decision and internal quotation marks & alterations omitted).  However, 28 U.S.C. § 1292(a)(1), which governs appeals of interlocutory  orders granting or denying injunctions, provides courts of appeal with jurisdiction to reach the merits, at least where there are no relevant factual disputes and the matters to be decided are "closely related" to the interlocutory order being appealed.  *See Jones*, 569 F.3d at 269 (citing, *inter alia*, *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986)).